IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| PROPEX INC., | § | Case No. 08-10249 |
| PROPEX HOLDINGS INC., | § | Case No. 08-10250 |
| PROPEX CONCRETE SYSTEMS | § | |
| CORPORATION, | § | Case No. 08-10252 |
| PROPEX FABRICS INTERNATIONAL | § | |
| HOLDINGS I INC., | § | Case No. 08-10253 |
| PROPEX FABRICS INTERNATIONAL | § | |
| HOLDINGS II INC., | § | Case No. 08-10254 |
| | § | |
| Debtors. | § | |
| | § | Chapter 11 |
| | § | |
| | § | Jointly Administered Under |
| | § | Case No. 08-10249 |

**DEBTORS' REPLY TO OBJECTION AND MEMORANDUM OF LAW IN SUPPORT
OF DEBTORS' MOTION TO (A) APPROVE BID PROCEDURES RELATING TO
SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) SCHEDULING A
HEARING TO CONSIDER THE SALE; (C) ESTABLISHING PROCEDURES
RELATING TO ASSUMPTION AND REJECTION OF CERTAIN CONTRACTS,
INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; AND (D) APPROVING
EXPENSE REIMBURSEMENT AND BREAKUP FEE PROVISIONS**
(this relates to Docket Nos. 890 and 899)

Propex Inc. ("Propex"), Propex Holdings Inc. ("Holdings"), Propex Concrete Systems

Corporation ("Concrete"), Propex Fabrics International Holdings I Inc. ("Fabrics I"), and Propex

Fabrics International Holdings II Inc. ("Fabrics II"), each a debtor-in-possession (collectively,

the "Debtors"), as debtors and debtors in possession, hereby submit this reply ("Reply") to the

objection filed by BNP Paribas ("BNP") and memorandum of law in support of the Debtors'

motion for entry of an order (A) approving bid procedures relating to the sale of substantially all

of the Debtors' assets, (B) scheduling a hearing to consider the sale, and (C) establishing

procedures relating to the assumption and assignment of certain contracts, including notice of

proposed cure amounts and request for expedited consideration ("Bid Procedures Motion,")
(Docket No. 890).  In support of their Reply, the Debtors respectfully represent as follows:

### <u>SUMMARY OF REPLY</u>

The BNP Objection raises three (3) categories of issues: credit bidding, the breakup fee
and specific comments to the terms of the stalking horse bid evidenced by the Agreement
attached to the Bid Procedures.  The Objection should be overruled and the Bid Procedures
Motion should be granted[1].

First, credit bidding should be prohibited under the circumstances in these cases because
it will not contribute to maximizing the value of the Debtors' estates.  To the contrary, the
potential for credit bidding by some of the Pre-Petition Lenders will chill bidding, discourage
parties from becoming involved in the auction process, and drive down the purchase price of the
Debtors' Assets.[2]  Further, credit bidding is inapplicable when, as here, the validity of the
proposed credit bidder's liens are in dispute.  Further, due to the facts here, credit bidding would
pose a number of significant legal and practical challenges.

Second, the proposed breakup fee is typical in stalking horse bids in Section 363 sales
and here, is reasonable in relation to the value of the Assets.  Moreover, the breakup fee was
necessary to convince the Proposed Purchaser to accept the risk of its stalking horse bid and,
importantly, incur the significant expense of time, resources and fees in making such bid.  By
inducing an initial acceptable bid that will likely generate additional bids, the stalking horse bid
with its Breakup Fee will contribute to maximization of the ultimate purchase price of the
Debtors' assets.  Thus, the proposed Breakup Fee should be approved.

---

[1] Black Diamond separately filed an objection but after the objection deadline (Docket No. 904). This late objection
joins in the BNP objection and raises no new issues.

[2] Terms not defined herein are defined in the Bid Procedures Motion or the Bid Procedures attached thereto.

Lastly, the Objection notes a handful of "improvements" or changes to the Agreement it suggests be made.  These changes ignore the fact that the March 4 hearing is not the hearing seeking approval of the Agreement.   Also, to the extent the Objection contends that the Agreement is somehow favorable to the Proposed Purchaser, such treatment is equally available to any other Qualified Bidder.   Notably, any other bidder has ample opportunity to provide "improved" terms and conditions in its own asset purchase agreement to make its bid a "higher and better bid."  The requested language changes in the Agreement are irrelevant to the March 4 hearing and premature since parties have an opportunity to provide terms and conditions in their own asset purchase agreement as part of their bid.

## **REPLY**

## I.      **The Court Should Prohibit A Portion of the Pre-Petition Lenders From Credit Bidding**

1.      At the outset, it should be noted that the Objection fails to identify how many and what percentage of the Prepetition Lenders support the Objection; the Debtors understand that the Prepetition Lenders are not unanimous in their views or supportive of the Objection.

2.      The Objection first challenges the Debtors' request for an order prohibiting credit bidding.  Importantly, the relief sought by the Debtors is statutorily authorized, recognized by the applicable case law, and is appropriate under the circumstances.

3.      Bankruptcy Code § 363(k) permits secured lenders holding "allowed claims" to credit bid and to offset their claim against the purchase price of the sale property if they are the successful bidder—unless the Court "for cause" orders otherwise.   11 U.S.C. § 363(k); *In re Theroux*, 169 B.R. 498, 499 n.3 (Bankr. D.R.I. 1994) ("[T]here is no absolute entitlement to credit bid.").  Cause is not defined by § 363(k), but is "intended to be a flexible concept enabling

a court to fashion an appropriate remedy on a case-by-case basis." *In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *16 (Bankr. D.N.J. June 29, 2006).

4.    Cause is present in these cases because credit bidding likely will chill other bidding, the validity of the Pre-Petition Lenders' liens is in dispute, and significant legal and practical challenges will make credit bidding difficult to administer.

### A. *Credit Bidding Under These Circumstances Will Chill Bidding by Others*

5.    The overarching reason that credit bidding by certain of the Pre-Petition Lenders is inappropriate in these cases is that it will inhibit the Debtors from maximizing the value of their Assets because it will create a disincentive for other prospective purchasers to become involved in the auction process and actively bid.  This chilling effect is clear and inevitable given the dominant size of the entirety of the Pre-Petition Lenders' claim, which is approximately $230 Million, compared to the reasonable range of value for the Assets.  Simply put, the ability of certain of the Pre-Petition Lenders to credit bid in amounts greatly in excess of the reasonable range of value of the Assets makes it less likely that other bidders will become engaged in the process, spend the due diligence time and money and submit competing bids.  In fact, it defies logic to assume that the presence of such an inordinately large credit bid will not deter cash bids.

6.    As a result, if credit bidding is allowed, there likely will be fewer bids, and this lack of competitive bidding will almost certainly lead to a lower final purchase price.  This scenario is patently inconsistent with the goal of the auction process in § 363(b) sales, which is to sell assets for the highest price and thereby maximize value for the Debtors' estates.  *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564 (8th Cir. 1997) (observing that the purpose of a § 363 sale is to maximize value); *In re Jillian's Entm't Holdings*,

327 B.R. 616, 618 (Bankr. W.D. Ky. 2005) (holding that an auction would achieve the goal of maximizing the return to the bankruptcy estate).

7.      Not surprisingly, several courts have recognized that credit bidding by dominant creditors is unfair and is likely to chill bidding.  *See, e.g., In re Antaeus Tech. Servs.*, 345 B.R. 556, 564 (Bankr. W.D. Va. 2005) (noting that § 363(k) "cannot alter the economic realities that an auction sale in which one bidder is an existing lender who does not have to put up new money . . . is not a sale in which the bidders are on a level playing field"); *In re Moonraker Assocs. Ltd*., 200 B.R. 950, 955 (Bankr. N.D. Ga. 1996) ("A dominant creditor could submit a bid over and above a 'reasonable' assessment of the value . . . . Such a bid could effectively displace all other bids and any benefit to be achieved through such competitive bidding . . . would be virtually nonexistent."); *In re Theroux*, 169 B.R. at 499 (disallowing credit bidding where contracted sale price was "clearly inadequate").

8.      For example, in *In re Antaeus Tech. Servs.*, the court criticized credit bidding as skewing a proposed sale where a potential purchaser had agreed to act as a stalking horse bidder. 345 B.R. at 564.  Although the court ultimately concluded that a secured creditor had waived the right to credit bid by failing to comply with an earlier agreement, this conclusion was clearly influenced by the fact that credit bidding would have been unfair under the circumstances.  *See id*.

9.      In the same way that credit bidding would have skewed the proposed sale in *In re Antaeus Technical Services*, it will also skew the Debtors' proposed sale in this case.  *See id.*  Credit bidding of such a dominant claim would chill bidding from others, thereby frustrating the purpose of the sale auction process.

10.    Contrary to the implication in the Objection, the request to prohibit credit bidding originated with the Debtors based on initial market feedback from prospective interested parties and the experience of the Debtors' professionals.  This request is based on the specific facts in these cases and was not, and indeed is not, an attempt to tilt the process to the benefit of the Proposed Purchaser or any other party.  Under the circumstances here, prohibiting credit bidding maintains a level playing field and provides equality for everyone with objective measures to determine higher and better bids as part of a competitive bidding process.

### B. Credit Bidding is not Allowed When the Validity of the Lien Securing the Claim is in Dispute

11.    "The intent of Section 363(k) is clearly to permit only those persons with a valid security interest in property to be sold to claim a setoff."  *Bank of Nova Scotia v. St. Croix Hotel Corp.* (*In re St. Croix Hotel Corp.*), 44 B.R. 277, 279 (Bankr. D.V.I. 1984).  Recognizing this purpose, courts have denied the opportunity to credit bid when a bona fide dispute exists regarding the validity of the lien forming the basis for a credit bid.  *See Nat'l Bank of Comm. v. L.D. McMullan (In re McMullan)*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) (holding that a secured creditor could not credit bid "because the validity of its liens and security interests are unresolved"); *Morgan Stanley Dean Witter Mortgage Capital, Inc. v. Alon USA L.P. (In re Akard St. Fuels, L.P.)*, No. 3:01-CV-1927-D, 2001 WL 1568332, at *3 (N.D. Tex. Dec. 4, 2001) (refusing a request to credit bid where the secured creditor's lien was subject to a bona fide dispute that could not be resolved before the sale).  These holdings are based on the recognition that a bankruptcy estate would be harmed if credit bidding is allowed and the purchaser's disputed lien is invalidated following the sale.  *See In re McMullan*, 196 B.R. at 835.[3]

---

[3] Some courts have allowed credit bidding in this situation when the party seeking to credit bid has offered to post an irrevocable letter of credit payable to the bankruptcy estate in the event that it loses a pending lien dispute, *In re Octagon Roofing*, 123 B.R. 583, 592 (Bankr. N.D. Ill. 1991), or when the party seeking to credit bid is "one of the

12.    Certain of the Pre-Petition Lenders should not be allowed to credit bid because the validity of the Pre-Petition claims and liens is subject to a bona fide dispute.  On September 23, 2008, the Creditor's Committee initiated an Adversary Proceeding (the "Committee Complaint").  The Committee Complaint alleges, *inter alia*, that the Pre-Petition Lenders' claims and liens should be equitably subordinated on account of the Pre-Petition Lenders' "inequitable and unlawful conduct." Committee Complaint at ¶¶ 72-77.  The Committee Complaint also alleges that certain security interests purportedly held by the Pre-Petition Lenders should be avoided.  *Id*. at ¶¶ 90-92, 94-97.

13.    The Committee Complaint, if successful, could result in the subordination of all or a substantial portion of the Pre-Petition Lenders' claims and the avoidance of some of their security interests.  Thus, the Committee Complaint places the current status of the Pre-Petition Lenders' claims and liens in serious doubt.  The Committee Complaint remains pending and likely will not be resolved prior to the bid and auction process set forth in the Bid Procedures. As a result, certain of the Pre-Petition Lenders should not be allowed to credit bid their disputed claim.  Notably, the Objection is completely silent on this issue and such omission is a clear acknowledgement that these lenders have no credible response on this important legal point.

### C.    Credit Bidding Would be Impractical Under the Circumstances and is Limited by the Pre-Petition Credit Agreement

14.    Next, credit bidding would be highly impractical under the circumstances.  The Pre-Petition Lenders are a substantial group made up of a number of individual lenders (15 - 20), each holding different amounts of the total debt (acquired at different times and different par

---

largest financial institutions in the world" and has promised to pay cash and all accrued interest in the event that it loses the lien dispute, *Bank of Nova Scotia v. St. Croix Hotel Corp.* (*In re St. Croix Hotel Corp.*), 44 B.R. 277, 278-79 (Bankr. D.V.I. 1984).   None of the Pre-Petition Lenders have offered to post such a letter of credit or to enter into a binding contract to pay cash in the event that their liens are invalidated.

values) and each potentially having very different views about credit bidding.[4]  Because of the

number of lenders and varying debt amounts, the Court would have to approve a procedure to

determine and verify how much of the debt each lender holds.  Moreover, the Objection fails to

describe the basis for how an alleged majority of lenders can force non-consenting lenders into a

credit bid against their wishes.  Furthermore, here, because of the absence of unanimity, a credit

bidding lender would have to pay a pro-rata cash payment to a non credit bidding lender.  This

scenario undermines the purpose of credit bidding.  With these kinds of considerations at play,

coordinating a credit bid at the Auction with a large and evidently split group of individual

lenders would be impractical.[5]

15.     Furthermore, in this case it is impossible for a credit bidder to prevail through a credit

bid alone.  There are significant cash requirements necessary to satisfy the current DIP,  contract

cure amounts, ordinary course trade claims, ordinary course professionals, customer orders and

assumed employee obligations.  Thus, a true credit bid involving no cash payment is impossible

in these cases.  *Cf. In re NJ Affordable Homes Corp*., 2006 WL 2128624, at *16 (allowing credit

bidding but requiring a secured lender to pay the "Buyers Premium" in cash pursuant to court's

procedures order).

16.     Additionally, credit bidding in a § 363 sale is limited by the language of the pre-

petition credit agreement.  *See* Propex Fabrics Inc. Credit Agreement, dated January 31, 2006

("Pre-Petition Credit Agreement").  The Pre-Petition Credit Agreement does not provide for

---

[4] As the history of this case demonstrates and based on testimony before this Court, the Pre-Petition Lenders have had differences of opinion among themselves before and have acted in their own interests without the support of the Agent.  *See* Objection of Majority of Pre-Petition Lenders to Debtors' Motion for Post-Petition Financing . . . . (Docket No. 884).

[5]  The Objection states, erroneously, that the Proposed Purchaser's financial bona fides was "deemed" acceptable because of the prepetition claim.  This statement is wrong, the Proposed Purchaser has provided information regarding its ability to close on a sale, closed on a $65 million DIP facility and has posted the $5 million Good Faith Deposit.  Particularly in the current economic and credit environment, any prepetition lender who desires to make a bid, would have to provide their own financial bona fides and Good Faith Deposit similar to any other bidder.

credit bidding in a § 363 sale context; instead, it limits the Pre-Petition Lenders to credit bid only

in foreclosure situations. *Id.* at § 9.6. Thus, certain of the Pre-Petition Lenders should not be

permitted to exceed the language of that agreement and credit bid at the Debtors' proposed sale.

The bid and auction process here is for a going concern sale which is vastly different from a

foreclosure sale.

17.     Interestingly, at no point does the Objection state that certain of the Prepetition

Lenders have committed to credit bid in the context of acquiring the Assets as going concerns.

Such lack of commitment turns this into a hypothetical issue rather than one which is concrete

and real. A party desiring to submit a Qualified Bid needs to be serious and ready to invest the

due diligence time and resources and the significant costs necessary to acquire the Debtors' on-

going business operations including retention of approximately 2,000 employees in the United

States.. Because of the particular facts and circumstances here, the Court should, as statutorily

authorized in Section 363(k), prohibit credit bidding.

## II.     The Proposed Breakup Fee is Reasonable and Should be Approved

18.     As is typical in context of a stalking horse bid, the Debtors request that a reasonable

breakup fee be approved in these cases to provide a material inducement for, and as a condition

of, the Proposed Purchasers' entry into the Agreement. Contrary to the arguments contained in

the Objection, reasonable breakup fees that encourage bidding and enhance the value of the

bankruptcy estate are permissible and routinely approved.

19.     Courts consider a number of factors in determining whether a particular breakup fee

is appropriate, but generally breakup fees are permitted if they encourage bidding and help to

preserve the value of the estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien

Envtl. Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999); *see also In re Tiara Motorcoach Corp.*,

212 B.R. 133, 137 (Bankr. N.D. Ind. 1997) ("[A] court should insure that revenues are maximized and that the best interests of the debtor's estate, creditors and equity holders are furthered.").[6]

20.    In determining whether a proposed breakup fee meets this requirement, most courts consider the following types of factors: (1) whether the breakup fee "correlates with" the maximization of value to the estate, (2) whether the parties to the breakup fee negotiated at arms-length, (3) whether creditors support the fee, (4) whether the fee is reasonable in light of the proposed purchase price, (5) whether the fee is so large that it will chill bidding, and (6) whether there is a material adverse impact on opposing creditors. *See In re Nashville Senior Living*, No. 08-07254, 2008 WL 5062366, at *2 (Bankr. M.D. Tenn. Oct. 22, 2008) (considering these factors in the "totality of the circumstances."); *see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res.*) 147 B.R. 650, 658 (S.D.N.Y. 1992) (considering, through the lens of the business judgment rule, whether (1) the parties negotiating the breakup fee engaged in self dealing or manipulation, (2) the fee discourages or encourages bidding, and (3) the amount of the fee is unreasonable relative to the purchase price).  The requisite benefit to the bankruptcy estate can also be found if the availability of a breakup fee induces a bidder to "research the value of the debtor and convert that value to a dollar figure on which other bidders can rely" because this increases the likelihood that the assets will be sold at their true value. *Calpine Corp.*, 181 F.3d at 537.

21.    *In re Nashville Senior Living* is a recent case that applied these factors in approving a breakup fee.  *See* 2008 WL 5062366, at *2.  The court there approved a fee that was bargained

---

[6] Other courts evaluate breakup fees under the "business judgment" standard.  *See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*) 147 B.R. 650, 658 (S.D.N.Y. 1992). The Debtors submit that if the Court sees fit to apply this standard, the proposed breakup fee is clearly a product of the Debtor's business judgment to promote competitive bidding and should be approved.

for at arms length, was supported by the primary secured creditor, was likely to maximize the value of the assets by providing a stalking-horse, and where the lack of a breakup fee may have resulted in the loss of the potential purchaser.  *Id.*

22.     Similar to *In re Nashville Senior Living*, the Breakup Fee at issue here is a reasonable percentage of the proposed purchase price (approximately 3% before considering the Assumed Obligations), was bargained for at arms length between the Proposed Purchasers and the Debtors, and is likely to maximize the value of the Assets.  The stalking horse bid was heavily negotiated and involved a number of concessions by the Debtors, as sellers, and the Proposed Purchaser in order to reach an acceptable agreement.  The Debtors requested that no breakup fee be included; however, the Proposed Purchaser was not willing to undertake the effort and significant cost to submit a stalking horse bid absent the Breakup Fee.

23.     It is also worth noting that there are key differences between these cases and those cases where courts have rejected a proposed breakup fee.  For example, in *Calpine Corp.*, the Third Circuit affirmed the denial of a breakup fee to Calpine, observing that Calpine submitted a bid even after its request for a breakup fee had initially been denied.  181 F.3d at 537 at 537.  Given this fact and the fact that many other bidders had emerged, the court concluded that the breakup fee was not necessary to promote competitive bidding.  *See id.* at 536-37.  By contrast, here, the Breakup Fee *was* necessary to induce the Proposed Purchaser to submit its stalking horse bid.  Stating an interest in submitting a bid and actually performing all the work and incurring the costs associated with a stalking horse bid, are very different things.  *See id.* at 537 (acknowledging that a benefit to the estate "could be found if assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made . . .").

24.     Further, the proposed Breakup Fee is not an unconditional right to payment and is accompanied by a legally binding purchase agreement, unlike several cases where breakup fees have been denied.    *See In re Hupp. Indus., Inc.,* 140 B.R. 191, 195 (Bankr. N.D. Ohio 1992) (denying an unconditional breakup fee that would have paid the stalking horse regardless of whether it was the ultimate purchaser); *see also In re Tiara Motorcoach Corp.*, 212 B.R. at 137-38 (denying a breakup fee where the proposed stalking horse had not entered into a binding purchase agreement).

25.     In sum, the proposed Breakup Fee will encourage bidding and therefore will help maximize the sale price.  Based on the above-cited authority and the fact that, if the Breakup Fee is triggered, the Proposed Purchaser's efforts will have increased the chances that the Debtors will receive the highest or otherwise best offer for the Assets, the Debtors submit that the proposed Breakup Fee is fair and reasonable and should be approved by this Court.[7]

### III.    The Agreement is Not Set for Hearing and Changes to It Are Premature and Beyond the Scope of the March 4 Hearing

26.     In the third and final portion of the Objection, BNP suggests certain changes to the terms and conditions of the Agreement.  These suggested language changes are not well taken and/or outside the scope of the March 4 hearing.  This hearing is only for approval of the Bid Procedures.  On March 24, the Court will conduct a hearing on approval of the Successful Bid and it is premature to suggest that the Agreement is such bid.  The Debtors will address these comments at the March 4 hearing and will respond only to certain of them in this Reply.

27.     Based on the facts of these cases including the cost and time to try and separate the Debtors' business operations, the Debtors requested bids for only all or substantially all of their assets, not piecemeal bids.  The Court will hear evidence at the hearing on the basis for the

---

[7]   The Objection cites to requested changes in the Agreement to restrict what may "trigger" the Breakup Fee.  These provisions were negotiated as part of an overall acceptable stalking horse bid.

Debtors' business judgment in this regard.  This request originated with the Debtors based on

how their business operations exist and the time, logistics and costs that would have to be

incurred in a piecemeal sale process.  Coincidentally, it was the same Prepetition Lenders who

told the Debtors, just a few months ago, that they did not want to see a piecemeal approach to

these cases and now object to their own prior position.

28.    The various overbid increments are more than reasonable in these cases and

benefit the process.  Overbid increments as proposed are consistent with the market and

approved in virtually every auction process.

29.    The Objection asserts that section 2.5 of the Agreement provides too much

uncertainty.  This argument is without merit.  Section 2.5 is limited to assumed and assigned

contracts and simply provides that each purchaser, including the Proposed Purchaser, has the

ability to decide which executory contracts and leases it desires as part of its acquisition.  This

argument raises an issue not relevant to the March 4 hearing on the Bid Procedures.

30.    Next, the Objections complains about the contract cure amounts as exposing the

estates to too much risk.  While the Debtors would certainly appreciate any offer with an

unlimited checkbook for contract cure amounts (the Proposed Purchaser was not willing to do

so), they do not believe a bidder would do so in the context of these cases.  Instead, the Debtors

are providing a schedule listing each and every executory contract and cure amount and believe

that their numbers are and will be accurate.  Any Qualified Bidder will need to satisfy the

scheduled cure amount for each contract they identify to be assumed and assigned as part of their

bid.  There is certainly nothing unusual about such a process or unfair as exposing the estates to

unreasonable risk.  Again, this argument raises an issue not relevant to the March 4 hearing on

the Bid Procedures.

31.     Finally, the Objection posits that the Proposed Purchaser (and presumably any Qualified Bidder) in this section 363 process should, in addition to the purchase of the Assets and the Assumed Obligations, somehow also pay for the costs of administration and the wind up of these cases.  While there are arguments that support payment of bankruptcy administrative costs by the Prepetition Lenders, such arguments do not apply to a buyer of assets.  In fact, such an argument undermines the concept of a section 363 process.  The Prepetition Lenders had a number of opportunities via the Debtors' filed plan of reorganization and otherwise to deal with this issue; however, they could not reach a consensus.  Certain of them cannot now credibly assert that an asset buyer should take on this responsibility.  Once the Closing has occurred and it is clear what assets and administrative liabilities remain in these estates, the Debtors will turn their attention to the windup phase of these cases.  Importantly, this issue is not relevant to the March 4 hearing on approval of the Bid Procedures.

## <u>CONCLUSION</u>

For the foregoing reasons, the Debtors respectfully request that the Court overrule the Objection and approve the Bid Procedures as submitted.

Respectfully submitted this March 3, 2009.

**KING & SPALDING LLP**

By: /s/ Henry J. Kaim
    Henry J. Kaim
    Texas Bar No. 11075400
    HKaim@kslaw.com
    Mark W. Wege
    Texas Bar No. 21074225
    MWege@kslaw.com
    Edward L. Ripley
    Texas Bar No. 16935950
    ERipley@kslaw.com
    King & Spalding, LLP
    1100 Louisiana, Suite 4000
    Houston, Texas  77002
    Telephone:  (713) 751-3200
    Fax: (713) 751-3290

      - and -

    Shelley D. Rucker
    Tennessee Bar No. 010098
    Miller & Martin PLLC
    832 Georgia Avenue, Suite 1000
    Chattanooga, TN  37402-2289
    Phone: (423) 785-8289
    Fax: (423) 785-8480
    Email: srucker@millermartin.com

**COUNSEL FOR**
**THE DEBTORS IN POSSESSION**